Thank you, good morning, Your Honors. May it please the Court, my name is Kirsten Doolittle and I am here today on behalf of the appellant Denise Benz. In 2003, Denise Benz was hired by Crowley to work as its warehouse manager. In fact, she was the first and only employee that Crowley hired when it decided to open a warehouse operation here in Jacksonville. Twelve years later, and at the age of 58, Crowley fired Ms. Benz several days after her request for leave to care for her adult daughter who was treating with cancer. On these facts, Ms. Benz brought claims under FMLA interference and retaliation, an associational disability discrimination claim, as well as age and gender claims. The District Court below Crowley moved her summary judgment arguing that she was not terminated in violation of these statutes, but rather she was part of an October 2014 layoff and that she was selected for the layoff because of her poor performance. The District Court granted Crowley's motion on all of Ms. Benz's claims, and in doing so, made three errors. The District Court drew inferences in the light most favorable to the movement, to Crowley. The District Court resolved genuine issues of material fact, also in Crowley's favor. And finally, the District Court failed to apply the law of the 11th Circuit in evaluating Ms. Benz's prima facie age and her gender claims. On the first issue, Crowley drew inferences on actually the most critical issue in this case, and that dealt with the timing of Crowley's decision to fire Ms. Benz. The District Court ruled that Ms. Benz's FMLA and ADA claims could not survive summary judgment because Crowley had decided to terminate Ms. Benz in October 2014, but she didn't make a request for FMLA until January 2015. That conclusion, however, was based on an inference that the District Court drew with respect to Crowley's decision. The District Court relied on an October 2014 email from Ms. Benz supervisor Aisha Diaz to a Crowley vice president, and if I may, the email stated, We do have enough to let Denise go at this time. We will proceed tomorrow if you don't have any opposition to the determination. In response, Crowley's vice president wrote, Let's discuss who will call you. Ms. Benz was not terminated the next day. The reasonable and most plausible inference to be drawn from that email is that the vice president disagreed with Ms. Diaz's recommendation to fire Ms. Benz and told her not to. Instead, the District Court drew the opposite inference, that a decision was made in October to fire Ms. Benz. I thought we had Larkin's own affidavit. Your Honor, that's correct. Mr. Larkin, the Crowley vice president, did provide an affidavit stating that he assisted in making that decision with Ms. Diaz. However, it was error for the District Court to rely on Mr. Larkin's affidavit because he is not a disinterested witness and because there was plausible evidence in the record to contradict that testimony. I never heard of this rule that we can't rely on an interested witness. Every one of these witnesses is interested. Your Honor, in Reeves v. Sanderson . . . Didn't it say you can't do that if there's no corroboration? Yes, Your Honor. It says that although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe and give credence to the evidence favoring the non-movement as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that it comes from disinterested witnesses. Just like a jury would not be required to credit Mr. Larkin's testimony, the District  would have to conclude that no reasonable jury could find other than that the decision was made in October. That is true. Your Honor, I believe that the standard would be that while a reasonable juror could conclude that a decision was made, a reasonable juror could also conclude that no decision was made. On what basis? On the basis that while Mr. Larkin . . . excuse me, while Ms. Diaz's email said, I'm recommending that this happen, I'm going to do it tomorrow unless you disagree, she wasn't fired the next day. And so your only evidence that suggests that the decision was not made in October is that she was not, in fact, fired until February. The fact that she wasn't fired until February, yes, Your Honor, that is our strongest evidence. But in addition to that, we would submit that the record indicates that at no point from October until February, and even prior to October, at no point was Ms. Benz even put on notice that there was any performance deficiency. And under this case's decision in Weaver and Kilgore, that's evidence of pretext. If the employer is internally documenting criticisms of the employee's performance, but is not putting the employee on notice of that . . . I thought there was, back in May, there was the FWW, and then there were emails right along to Plaintiff herself telling her about the problems with her performance. Were there not? Am I mistaken? No, you're correct. In May 2014, there was a final written reprimand in which Crowley alleges that it had placed Ms. Benz on notice of certain deficiencies. After that, there were only two emails that are in this record, and of which we are even aware, that were in June 2014, that were sent to Ms. Benz. We would submit that those are arguably not even criticisms of her performance, but even saying that they were, nothing after June. Anything that was after June of 2014, until Ms. Benz was terminated in February of 2015, those were internal emails that were sent amongst Ms. Benz's manager, for which she was never placed on notice of any deficiency. This court has held that when an employer does that, and doesn't place the employee on notice of a problem, and then later claims that they were fired for poor performance in the face of a history, a 12-year history in this case, of strong positive performance, that that's evidence of pretext, sufficient to create a genuine issue. I would just reference the court to Weaver v. Casa-Gallardo from the Eleventh Circuit. As I understand the record, and correct me if I'm wrong, there's no evidence about Crowley discussing terminating Benz in January. We don't know where the . . . the subject comes up again in January, but is there any evidence of why they bring it up again? Your Honor, you're correct. The next time it comes up again is late January. They begin discussing scheduling the termination of Ms. Benz. This took place within days of Ms. Benz's, number one, her request for a week of leave to travel to care for her daughter. Prior to leaving for that week, her manager, Ms. Morales, asks, Ms. Benz, do you think you'll need to take additional FMLA? Ms. Benz responds, yes, I might. Within days of that discussion, we see this January email string scheduling the termination. Outside of that context, no, Your Honor. There's nothing in the record to explain, other than the facts that I just presented, why they were having that discussion in January. Your FMLA claim is based on that timing? Yes, Your Honor. In addition to- Only on the timing? No, Your Honor. If I could just clarify, Ms. Benz also took a month of FMLA in July of 2014. In her affidavit, Ms. Benz testifies that in that entire year of 2014, she had numerous discussions of a continuous nature, where Ms. Morales would ask her if she would need to take additional FMLA. Second, yes, there is additional evidence, and that is that Ms. Benz, while there was at best a discussion about whether to terminate Ms. Benz in October 2014, she wasn't terminated, and she continued to work there, I believe for nearly four months, until she took this additional week of FMLA qualifying leave in January, in which she had this discussion prompted by her manager about whether she would need to take FMLA, and she responded she might. Is there any evidence, as in the Phipps case, of the employer saying, well, you need to be here at work? In other words, saying anything negative about the fact, not just about FMLA leave, but that she would miss work and that that was a problem? Yes, Your Honor. I would direct the court's attention to- Oh, I see my time has run out. Okay, sorry. There is an email that is in the record from Ms. Diaz to Ms. Morales, and this was in about July of 2014, around the time she took the month of FMLA, in which Ms. Diaz conveyed her concerns about the fact that Ms. Benz was taking this month and her concerns about how that would impact things. But to your point, Your Honor's question, that was never conveyed to Ms. Benz. It was sent between the two managers. When they actually fired her, did they say it was a layoff, or did they say it was performance? Neither, Your Honor. When Ms. Benz was terminated on February the 6th, she was told that she was being terminated for budget cuts. And if I may- Did they say it was performance-related, or did they just say- No, Your Honor. There was never mention of her poor performance until litigation ensued. That's what I was trying to- I'm sorry. During January, February, when they did do it, they said, oh, it's budget cuts. Correct, Your Honor. Not performance. Correct. And that's something that you say also shows pretext. Yes, Your Honor. Okay, because you claim you've made a prima facie case, she was filled back, took her job, two younger white males, or I don't know- Yes, Your Honor. White males. So you're saying in the context of who all took her job, that you've made a prima facie case, so the fact that they didn't say performance goes to your pretext. Yes, Your Honor. Absolutely. It's not budget cuts or performance. Correct. And she was never told she was part of this massive layoff. Crowley separated 100 employees in October 2014. They got out placement services and other benefits. Ms. Benz was never told she was part of this layoff, as Crowley contends to. There's only one from Jacksonville laid off. Yes, Your Honor. Terminated so-called budget cuts. Yes, Your Honor. And in Mr. Larkin's affidavit in which he spoke to this purported decision to terminate her, he claimed that while there were 13 Crowley employees also being targeted for the layoff with Ms. Benz, he wanted to give her the grace of working through the holiday season again. So it's fair to say your case is we did the prima facie case. They come back with a legitimate reason, and I've shown I've got enough quantum of evidence to go to the jury on pretext. Yes, Your Honor. That's it. Thank you, Your Honor. You're answering the court's questions, so you'll get your full five minutes for rebuttal. Okay, thank you. Good morning. My name is Patrick Coleman. I have the honor of representing Crowley Maritime and Crowley Liner Services. In this case, following the appellant's termination in February of 2015, she filed a seven-count complaint under five statutes. I think the age and gender counts are the most easily disposed of. There is no evidence of age discrimination in this case. To show age, that has to be the sole reason for termination. They're offering nothing other than the fact that she's over 40 to show age discrimination. I thought they offered that she was replaced by two younger employees, and for purposes of my question, we've already held that you can divide the job up into two people, and that still counts. Okay, wasn't she, her duties were assigned to two younger employees, correct? The position of warehouse manager, Your Honor, was eliminated. I understand, but they assigned her duties to two younger male employees, right? That is correct. And that made a prima facie case, according to the district court. The district court gave them credit for that, but I don't think that's correct because . . . No, it is not. See, to me, the case, tell me why I'm wrong. She didn't have both. It was males. They were younger. She didn't have a prima facie case on all of these claims. All the cases cited in page 13 of our brief speak to this, Your Honor, that where you eliminate a position in a RIF, reduction in force, those duties are going to go to other people. In this case, one other position was created, but it was a supervisor's position. It wasn't a manager's position. The manager's position was eliminated, and the other supervisor . . . I thought we also had cases where you say it's reduction in force, but yet you still give it to all these other people and nobody else was fired. Reduction in force? You still have an issue of fact on that. Yes. This is not a termination case where you fire someone for protection of reason, give the duties to someone else. This position of warehouse manager was eliminated completely. Let me ask you this. Was she fired for budget reasons or was she fired for performance? Clearly, it was part of the layoff, Your Honor. Okay. So the company's position is it's one performance, it's budget. That's the reason we fired her. No, Your Honor. On September 30 . . . No, I'm talking about why you told her you fired her. What did you tell her? She was told . . . well, she says what she heard was budget cuts. Okay. What the HR person who laid off 50 other employees said, you're laid off. In fact, it is significant that we mentioned the declaration of Mr. Larkin. One of the things he was given was a severance worksheet. The plan was to lay the appellant off on October 14, 2014, and Mr. Larkin was given a copy of a severance worksheet that showed her severance pay for 11 weeks of severance was $14,900. On her deposition, Ms. Benz confirmed that upon her being laid off, she was given $14,900, just as planned, based on her 11 weeks of service. Now, as I started to say, on September 30, 2014, Crowley Maritime issued a memorandum to all its employees . . . We just have to say, what is the legitimate reason you say you fired her for, and you're saying it was budget cuts, and we never mentioned in January or February performance to her. Is that correct? That's correct, Your Honor.  Because . . . Let me take the case as the legitimate reason is budget cuts. The criteria for layoff under the company's policy, as articulated by the HR manager, was not only personnel, but performance. And here we had an employee, as the lower court found, with over a one-year period of well-documented performance issues, got the final written warning on May 22, went off on FMLE for a month. When she came back, she met with the HR person and her immediate supervisor. She disputed everything in the final written warning, wanted it taken out of her file, wouldn't acknowledge any of it. So, that is in August. In September, we come up with the company-wide layoffs. The selection of Ms. Benz for layoff was obvious, based on the criteria job performance, which is part of the layoff policy, as testified to by the HR manager. It's clear that Ms. Diaz was the decision-maker. Ms. Diaz said, unless you have objection, I'm going to lay her off tomorrow, October 31. Mr. Larkin, the senior vice president, said, let's discuss. He said, let's wait until after Christmas. Nothing changed between October and Christmas. Now, if the court were to find that the decision was not made in October by Ms. Diaz, then, in fact, it was made in January by Mr. Larkin, the case still fails because Mr. Larkin is three levels up. There's no indication, yet, any knowledge of FMLE leave, associational discrimination of the ADA with the daughter. He didn't know any about this. Whatever the decision was, it seems like it was both Diaz and Larkin together. It was Diaz's decision. It was Larkin's decision to postpone. Now, as to the timing, Ms. Diaz said that January 6 is a holiday, a Puerto Rican holiday, Three Kings Day. That takes us out to the 12th. Ms. Diaz said she tried to match her schedule so she could be present. They couldn't do that. They finally matched schedules on January 26 and said, all right, we're going to have the termination conference on February 6. Unknown to them, the appellant came in on February 4 and says, I need FMLE leave. Now, there is a dispute about the admissibility of the appellant's affidavit, which was given after I moved for a summary judgment. She refused to testify on deposition as to the reasons why she felt she was discriminating on the basis of age or race or gender or FMLE. But crediting the affidavit of the appellant, she said she came in the week of January 19 and said, my daughter is going to go in the hospital. She may need chemotherapy. I may need to be gone at some future unspecified date. That seems to be the basis for her retaliation and interference claims. To show interference, she has to show that the exercise of protected white was the proximate cause of the discharge. In view of the record we have before us, there's just nothing to show that. In terms of retaliation, temporal proximity can suffice. But for FMLE interference, she has to prove that the FMLE request was the proximate cause. And she just can't show that in this case. I think the criteria for- Did either Mr. Phillips or Ms. DeLaurent get a new job title when she was fired? I'm sorry, what was the question? Her duties were given to Mr. Phillips and Mr. Laurent. Did either one of them get a new title? I think one of them got a promotion. Mr. Laurent was always a warehouse supervisor under Ms. Benz, supervising two leads. Mr. Jeremy Laurent came from pricing on April 1, which is about two months after Ms. Benz left. Okay, and he got what title? Supervisor as well. Supervisor, and he took over some of her duties. Well, her duties were to supervise the supervisor. The supervisor was to supervise the leads, who in turn supervised the Crowley employees and the temps. I'm just trying to figure out who took her job and whether they had a title change and where they came from. Mr. Laurent was already there. He was already there. And he supervised the leads. And he worked under Ms. Benz. Ms. Benz. When Mr. Phillips – And Phillips was not there. He moved over to be a warehouse – He came too much later from pricing. His job also was to supervise the leads. They previously – Mr. – but the supervisors previously reported the warehouse manager. Did he get a pay increase, or does the record tell us? I'm sorry, did who? Mr. Phillips got a pay increase. I know he got a new job. I don't know that, Your Honor. I think he was paid approximately $60,000 a year. Well below what – Well, when Ms. Benz was there, she reported to the logistics manager. When her job was eliminated, the logistics manager of the job went to a lady named Crystal Mason. Crystal Mason, the two supervisors, then reported directly to the logistics manager. So that whole level of management, the warehouse manager, that position was totally eliminated. That's why they were not replaced by these two supervisors. She was not replaced by the two supervisors. Let me ask you this. How do you respond to the plaintiff's argument that we should discount the affidavit of Larkin? As an interested witness? Yes. Your Honor, if the court were to discount the testimony of interested witnesses, that would do away completely with the whole McDonnell-Douglas paradigm. Our duty is to articulate a legitimate, non-discriminatory reason. I don't know who could do that for an employer other than someone with knowledge. Someone with knowledge is therefore an interested witness. So I think that whole argument caves under its own weight. I think what they're basing it on is a misreading of Reeves v. Sanderson-Plumbing. And what that court basically said was, where you have a dispute between the moving party and the non-moving party, the court should not make credibility resolutions. In the Reeves case, however, the court found the jury could well find that the reasons given by the employer were pretextual. They said the man was sold. He could have come over in the Mayflower. But if you look at other cases, Price v. Time, for instance, the court said to hold that testimony under oath by an interested witness cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment. That's Price v. Time, which is cited in our briefs. Also in Foster v. BioLife Plasma, the court said if the testimony of interested witnesses is inherently plausible and corroborated by other evidence, then summary judgment may be appropriate. And here we have plenty of other evidence for the fact that this woman had severe performance problems. What other evidence corroborates his Larkin's testimony that he accepted Morales and Diaz's recommendation to let her go but delayed it until after Christmas? What other evidence corroborates that? Nothing other than the fact that she was not laid off until February. And, of course, the e-mail exchange that took place in January between Ms. King and Ms. Morales, the two people that actually attended the layoff. What does that e-mail correspondent say? Basically, they went back and forth in match schedules. When can you be available? When can you be available? They had both agreed on February 4, 2015, is the date when they could both meet with Ms. Benz. So February 6 was the date they agreed upon. February 4 was when Ms. Benz came in and said, all right, I'm going to need additional leave. What about the deposition testimony? I believe Morales and King and Diaz testified by deposition, did they not? They did. What did they say about this delay from October to February? Ms. Diaz said she tried to work her schedule out, and when she couldn't she said my appearance was not necessary, so the other two proceeded without her. The only thing Ms. Diaz really said is she was questioned about Three Kings Day in Puerto Rico, and she said the week of the 6th is still a family holiday, so I didn't report back until the 12th. And two weeks went by, and it's not on the record why they could not get together, but they could not get together until January 26 to discuss an actual termination date. But there is nothing to indicate. What do I do with this email by Ms. Diaz, June 30th? I'm concerned about this FMLA from Denise. That's the FMLA she took in the summer. I think we need a backup plan in place. That's right. They need a backup. Well, bear in mind. I mean, that looks pretty bad. She's taking FMLA leave, and so we need some backup plan to fire. I mean, why can't that be an inference from that? I don't think that's a reasonable inference at all, Your Honor. This is right after the final written warning, and she's saying we need a backup plan. We need coverage. And the coverage was Ms. Morales, who was a logistics supervisor, had to cease her duty and spend more time in the warehouse supervising Mr. Laurent and the leads, which she did. And it's during that time that Ms. Morales discovered that a lot of the same criticisms contained in the May 22 final written warning were still happening. They didn't have the standard operating procedures. They weren't having meetings. The people were unhappy. They didn't like to come to work. And things were much better when Ms. Benz was not there. What Ms. Diaz was saying is I am concerned about her being gone. We've got operational problems anyway. Who's going to cover? And it turned out that Ms. Morales came in and covered. It would be one thing in this case if you'd said here are your performance problems. After June said you haven't complied, and then you wrote a letter saying we're terminating you because of performance. Your Honor, that's not what the record reflects. I know. You say it's budget cuts, not her performance. Well, they sat down with her in May. I just don't know why that didn't get into pretext. Well, they sat down with her in May 22. The day after she gives more FMLA leave. That's what I'm struggling with. They sat down with her on May 22 and said we have severe performance problems, which were confirmed when Ms. Morales took over the warehouse the whole month of July. When she returned in August, she sat down with Ms. Morales and Ms. King from HR, disputed all the performance issues, wanted it removed from her file. They said, no, we're not removing this from your file, so this is August. When did that occur? August. Nobody knows the exact date, but it was early August. So here we are in August when she's saying I don't have performance problems. Then September 30 is the memo to all Crowley employees saying we're going to have layoffs. She made herself a very obvious choice for layoff under the layoff criteria, which specifically addresses job performance. So the decision to lay her off in October was made in October. There was no point in, if she's going to be caught in a layoff, no point in readdressing all these performance issues that she disputed anyway, would never change. So the decision was made in October, but because Mr. Larkin was not implemented until January, well, the calendars got together January 26 to be implemented on February 6. If I understand it, there's no evidence directly linking the layoff to the performance problems, other than the fact that layoffs were generally based on performance problems. There is a plethora of evidence, Your Honor. If you look at the email exchanges between Ms. Morales, Ms. Diaz, Ms. King, and Mr. Larkin, all of which took place in October, there are three or four emails that specifically address the performance problems to why she selected for layoff. Your Honor, it wasn't based on the timing. It was around the time that the layoff was happening. They didn't readdress the performance problems in January? No. I thought in the announcement of the reduction in force that occurred in October, I mean at the end of September, that it was written as if the decisions had already been made. In other words, it didn't say we're going to be making decisions. It said we're going to be letting the employees know. Am I wrong on that? We will be implementing layoffs in September is what the memo said. Thank you. May it please the Court. I'd like to address two points. First, I'd like to address the Court's concern over the issue of reliance on interested witness testimony. Counsel cited or brought to the Court's attention the case of Foster v. Bialoff-Plasma, which is an Eleventh Circuit decision. However, he did not mention the sentence that precedes the quote that he provided, and that states, quote, a court should not generally grant summary judgment or directed verdict based solely on the favorable testimony of an interested witness. However, if the testimony of an interested witness is inherently plausible and corroborated by other testimony, then it may be appropriate. I would submit to the Court that the other testimony, it can't be testimony from other interested witnesses. It has to be evidence from disinterested witnesses or documentary testimony. In Kilgore, the District Court actually found, and that was a 2016 Eleventh Circuit decision, that it was error for the District Court to rely on the testimony of the interested witnesses regarding the actual basis of the reason for the termination. Here, that's what Crowley is trying to do again, is rely on the testimony of its interested witness to support the timing and the basis of the termination. That's contemporary email. Absolutely. If there was a contemporaneous record of an email saying she's fired. Well, we do have contemporaneous emails that clearly establish that the three people who really made the decision subject to Larkin's approval had made the decision as of October, King, Morales, and Diaz. Then we have contemporary emails which corroborate that the reason she wasn't fired right after Christmas was they couldn't get together their schedules. Your Honor, I would respectfully disagree that we have contemporaneous evidence of a decision to terminate. Ms. Diaz testified under oath in response to interrogatories that Mr. Larkin was the decision maker, that she did not have that authority, and that's why she was asking for his approval. In fact, in a Tennessee District Court decision, the District Court was faced with facts that are actually even stronger in the employer's favor than ours, where the employer had actually made a decision to fire an employee before the Christmas holidays, decided to hold off on that decision. In January, the employee requested FMLA, and two days later, the employee was fired, and the employer in that case made the same argument here. We'd already made this decision before the request, and in that case, the District Court found that a reasonable juror, that based on the delay, and I can't find it, but I think I'm pretty close to it, a reasonable juror could have concluded that the employer decided that it was okay, we're going to let this employee continue to work. If Larkin were the decision maker, there's absolutely no evidence that he even knew about the FMLA. Your Honor, that is not spoken to in the record. I will submit to the Court, however, that Mr. Larkin said that he decided to allow Ms. Benz to continue working, unlike the 99 other Crowley employees who were laid off, that he allowed her to continue working so as not to impose a hardship on her, without any reason explaining why she was the only one given that benefit. It might be an inference that he did know that her daughter was in trouble. Absolutely, Your Honor. We would submit that a reasonable juror could absolutely draw that inference, just as a reasonable juror could draw the inference from the email that Judge Hall pointed to, the June 2014 email when Ms. Diaz is noting her concern about this problem with Ms. Benz taking FMLA leave for the month. Just in conclusion, Ms. Benz submitted ample evidence from which the Court could conclude and should have concluded that there was a genuine issue that should have gone to the jury. They changed their reasons for why she was terminated, they never brought these purported deficiencies to her attention, in the six months following May 2014, and Ms. Benz states that fact. Just like the plaintiff in Damon v. the supermarket case, the plaintiff flatly refused that those criticisms were ever brought to her attention, and with a record of solid performance, that's evidence sufficient to create a genuine issue. For these reasons, we respectfully request that the Court reverse the District Court's order and remand it to District Court. Thank you. Thank you, Counsel. The Court will be in recess until 9 a.m. tomorrow morning. Good night.